You can come on up, Mr. Taylor, but we'll give him a chance to... He's out. Just hang on a second, we'll give him a chance to... All right, Mr. Taylor, we've got you in this one, and of course we consolidated the two, so obviously the same facts, and so on and so forth, so we've got two appeals, but kind of don't necessarily want the longest version of it, since you get two shots here, so we'll hone in on the issues in the first one, and obviously we'll get to the other one, but just be mindful, we're aware of that. The facts don't change when we shift. Thank you, Your Honor. If it pleases the court, then what I think I would like to do is, I think the second appeal against the insurer will focus more on the details of the facts themselves, which were developed at summary judgment. If those facts are sufficient, they're also going to be sufficient going forward in the first appeal, since the allegations are the same as the evidence that was ultimately produced, albeit with slightly less details. So in light of your comments, I think what I would like to do in this first one is to focus on the distinctions between adjusters and insurers under the laws. There are some splits among the lower courts in this circuit regarding the standards to be applied under the Texas Insurance Code, and if there's something else you decide you would like me to address instead of that, jump in, obviously. The first split that is at issue is what I referred to as the Messerschmitt line of cases, and the cases on the other side, which involves the question of how Chapter 541, and particularly, most significantly, Section 541.060A2, the failure to effectuate statute, applies to adjusters. Does it? Does it not? The cases against it that I referred to as the Messerschmitt cases came from Judge Solis's Messerschmitt opinion, in which Judge Solis made basically a one-sentence analysis out of whole cloth. Well, let me just say, irrespective of that, even if we assume that that provision of the code applies to the adjusters, how have you stated a claim? Referring just to that particular statute, for instance, then, it's going to be the same as against the insurer. Well, you're claiming that there was essentially fraud, right? I think you don't even have to get to fraud. Fraud comes later. What you have is a scenario. The factual highlights are at least by September 2016, they were aware that there was a code upgrade question. The adjuster, on behalf of the insurer at that point, asked for an engineer's report from the insurer, which was provided. That was at least by November. At the same time, or shortly thereafter, he asked for a bid, for the insurer to provide a bid, because all of the statements say we want to develop an agreed scope, we want to look at the cost. Well, there's no question that the church got sandbagged. But on the other hand, anybody who has any kind of major repair or construction project is often surprised by something that the contractor or the architect didn't anticipate. And quite often, those are just the subject of a change order, but they are not the subject of claims for misrepresentation, failing in good faith to effect a prompt fair and equitable settlement, or failing to promptly provide a reasonable explanation of the basis for an insurer's denial of a claim. The significance here is that the low end of that, the bid was $285,000, whereas the full amount of coverage on this claim was $250,000. By September, or by November at least, when he had the engineer's report and the bid, that adjuster and the insurer knew that the claim was going to exceed the full value of the coverage. But the church got what it paid for, correct? In other words, the $685,000 was a legitimate charge, I think it was $600,000, for what the church got, which was a replacement of a large portion of the roof.  I think the problem here is the additional amount that is issued on both of these appeals is the additional increased cost by delay in effectuating a settlement of the claim. By not approving, not accepting the claim in November or December, or even in January, and saying, here, this is covered, we'll pay this, you do the repairs, we'll pay you as soon as you get the repairs. By not accepting the claim at that point, and instead taking an entirely different, and I've never seen it before, I've never found it in the case law position, of independently going to the roofer and saying, let's do it on a different approach. Let's do it on this uncapped approach. It resulted in $600,000 extra cost. Let me just ask you a question. But the insurance company paid all that it was required to pay under the policy. Under the policy, yes, ma'am. These are for additional. I just had this question in the back of my mind. Was Saru for a member of the congregation per chance? It's not in the record. I don't have any idea. I don't think so. But I do not know the answer to that. I'm pretty sure it's not in the record. I don't know the answer. I've never met either one of them. So what you have here is because of the delay, because of the delay in effectuating, and going beyond that to actually interrupting the agreement or potential agreement, however you want to look at it, between the roofer and the church, you increased the cost by $600,000. The question isn't how much it would have cost to the roofer. The roofer made an underbid. I think everybody, Lexington or York's words, that this was a gross underestimate. But the factual record shows that they never would have, nevertheless, the roofer would have honored that bid if it had been accepted at that time. This was an arm's length. You really want a roof where the roofer charged you one-third of what the actual cost was? I'm not really sure. That's a rhetorical question. In any event, that type of situation is pretty well established in the law outside of the insurance conduct. But let me, again, you know, all this is very, very unfortunate, but the provisions of the code that you say are violated have to do with misrepresenting a material fact or policy provision relating to coverage. No, misrepresentation only comes in later if you don't agree that the adjuster actually interrupted the benefit of the bargain. What we've got in the first layer. Where is that interruption of the benefit of the bargain codified as misconduct in the Texas Insurance Code? What's codified in the insurance code is a duty to effectuate a settlement when it's reasonably clear, which would have been November or at the latest December. At that point, it was reasonably clear this was going to be for the full policy limits of $250,000. The adjuster and the insurer had a duty at that point to effectuate a settlement. Instead, they didn't. So what they did instead was the adjuster goes to the roofer independently without first going to the church and asking and agrees, quote, agrees with the roofer to do it on a different uncapped time and materials basis. Well, but the point is that was to comply with the local building code, right? No. I thought the whole point was that it was going to cost more to comply with the building code. I'm not sure I understand that question. Well, maybe I don't understand the facts, but I thought that the whole one major reason, one particular reason why it was underbid was that the code compliance was more costly than the adjuster had originally anticipated. That's what actually proved to be the case. But as I said, the roofer provided an arm's-length transaction, a fixed bid that it admittedly would have honored, even though it would have had to have done it at the loss. As of November, as of December, the church had in hand, with the roofer it was already under contract, had a bid. Well, just suppose, for example, that the roofer had done something which they knew was not going to comply with the code. That wouldn't be allowed, would it? And I don't know why that would not be allowed, but they would have had to have complied with the building codes, et cetera, get approval over that. There's nothing in the record that would suggest that the roofer would not have complied fully with all the requirements at $285,000. That's what the roofer's own witness under the affidavit said. We would have complied with that. We would have honored this bid. It wasn't an issue of that they would have then tacked on more and more and more. It's an issue more along the lines of if a guy offers me to sell me a Lexus at a low price and I have the opportunity to do that and somebody comes along and interferes with my right to buy the Lexus at a good bid, that's in the nature of going off a little off direction, but that's interference with a prospective contract, different elements for that claim. But if that occurs, my loss would be the lost benefit I would have obtained. That's the same scenario here. What legal cause of action is that? My hypothetical? No. Your obligation under Rule 8 and Rule 9 of the federal rules was to plead a cognizable legal claim against this adjuster. And how do you describe we're not in the world of the old pleading rules where you had to specify things totally precisely, but you do have to have a theory, and you identified three provisions of the insurance code, none of which appear to cover what you're talking about. So what else? The first one, the failure to effectuate, covers it directly. Once it is understood, it doesn't even actually require actual knowledge. Once the insurer, the adjuster, should have known that this would be covered, they have an obligation to effectuate a fair settlement at that point. They knew by November and December. So if they paid policy limits in November, your client would be in the same position they're in now, right? Not at all. Not at all, Your Honor, with all due respect. Here's what should have happened. Maybe this will clarify it. Let's back up, and we'll play pretend. We'll have a hypothetical scenario. In November, he gets the engineer's report, realizes this is very complex. We've got this is going to be over $250,000. The adjuster, the insurer, at that point, accept or deny the claim. They look at it and say, yep, this is covered. There's no question it was covered. We'll accept this claim. We don't even have to pay it right now, okay? But that's what the policy said. The policy said they weren't going to pay until the repair was complete. And the insurance code accounts for those types of situations. But that's not a violation, yes. And under 542, the Prompt Pay Act, 542.057, it allows for payment to be delayed based on a contingency. If it's something that the insurer has to do first, you can withhold the payment until five days after that. That's exactly what happened here. There's no allowance for a delay in acceptance or denial of the claim. The acceptance or denial has to occur promptly as soon as you know the facts needed to do it. What should have happened by November, by December, the adjuster and the insurer should have accepted that claim and said we will pay up to policy limits. You'll actually get your payments when you do the work, but we'll accept it right now. And here's what would have happened in that scenario. They had a roofer willing to take this and do this based on the assignment of benefits. The roofer then, or they could have separately got a loan for that amount. But they would have had the work done for $285,000. Who say they would have gotten a loan? The insurance company? What are you talking about? The church. Huh? The church. Well, that's what happened, isn't it? But they got a loan for 800 or 600 grand for whatever, the ultimate amount to do it. They would have had a loan for $285,000. They would have then got reimbursed for $250,000, and their out-of-pocket cost would have been $35,000. That's what would have happened if the insurance company had properly accepted the claim. Accepted the claim in November and December, even in January. $35,000 instead of $600,000. But then, look at this. Look what would have happened if they had denied the claim. If they said, nope, we're not giving you anything. But they didn't deny it. That's counterfactual, and it has nothing to do with your obligation to plead a case. But it illustrates the issue that was asked as to what are the damages. What's the different scenario? If they had denied it, we would still be here, or at least in the district court. But the suit would have been for the $285,000 because that's how much it would have cost the church to get the roof fixed. They would have had their roofer honor his bid, the arm's-length bid of $285,000. They would have gotten their roof fixed, and they would have got reimbursement for the cost. The only reason the extra cost to the church occurred is because the insurer and his adjuster did not comply with their obligation to adjust this claim properly in November, in December. Was there a signed contract with the roofer? Yes, there was. I don't know if it was in the record. Well, who signed it and when, and what amount? Again, I'm not sure if it's in the record. I don't think it is. My recollection is that it was a contract in advance for an open-ended amount that they were going to, did not know what the amount was at that point. The bid that we're talking about was a bid that was provided by Jeff Simmons, or Jeff Seymour, the roofing company, for $285,000. All that needed to be done to then activate that was accepting the bid. Why didn't the church accept the bid? Because they were told throughout this process, well, one, they never had the opportunity. They had been told throughout this process, and I'm almost out of time. Should I continue the answer? Yeah. Throughout this process that the process required an agreed scope. That's not from the insurance code. It's not from the contract. It's from what the adjuster told them, that we need to agree on a scope. We need to agree on cost. We need to agree on scope beforehand. So throughout this process they complied with what the adjuster was telling them to do. They went through. They did everything the adjuster asked. And then the adjuster, first without telling them, said, I've separately agreed with the roofer on a different process. Then the reason they still didn't object at that point, and frankly at that point I think a jury can decide, once he's agreed with them, the roofer doesn't have his obligation anymore. But assuming they could have objected and still gotten the $285,000 bid, that's when the misrepresentations come in, or the nondisclosures, or the implied misrepresentations under Anderson, Greenwood & Company, under this court's access medequip opinion, things like that, that what he did was telling them this is for the best. This time and material is the best approach. And he also made representations that indicated. Let me just stop you there. You've saved your time for rebuttal. I mean, Judge Jones started you on this question. I'm still not sure I understand your answer. But when you come back, I'm going to rebuttal. I appreciate it. On this first case, you got . . . there was a judgment dismissing your case. You know, on a vague, twombly, Judge McBride, and it was an amended complaint. A lot of times we get somebody saying, well, I didn't get a chance to amend. I would have said this. I would have said that. Here, there is an amended complaint. I heard all you said about the code and all that. But Judge McBride found it was conclusory. There was nothing pled. This is not fact pleading, as Judge Jones said. But it boils down to convincing us that somehow what you pled, notwithstanding what you say the code says, keeps you in court. So maybe you addressed that. But when you come back up, at least for me, hone back on the 8A standards . . . Yes, sir. . . . that you said that should have kept you in court. Because I'm not sure . . . You've answered a lot of questions about a lot of things, but in some ways they sound like fact issues, maybe in the next one. But this one was a pleading case, right? So, anyway, help me out. Maybe everybody else got it. All right. Mr. Rosen? Yes, Your Honor. Pleading case, right? Yes, Your Honor. May it please the Court. My name is Robert Rosen, and I represent the appellee, York Risk Services Group, Inc. As this Court has identified, the issue before the Court today in this particular matter is whether to affirm the District Court's decision to dismiss UBC's claims against York for failing to meet the pleading requirements set forth in Federal Rules 8 and 9, and ultimately for failing to state a plausible claim for relief under Federal Rule of Civil Procedure 12b-6. Despite UBC's arguments to the contrary, there's no need for this Court to decide complex or undecided issues to confirm that UBC's claims were properly dismissed. Instead, the crux of this case is whether UBC followed well-established pleading requirements of the Federal Rules and United States Supreme Court precedent. Because UBC did not follow the rules, its claims against York were properly dismissed. And I want to focus today on the primary reason for that dismissal, and that is their failures under Rule 8a-2. As this Court is well aware, a party must do more than simply allege legal conclusions or recite the elements of a cause of action. Here, you have causes of action against York under Chapter 541, four separate causes of action, a DTPA cause of action, one remaining, two others have been waived on appeal, and a promissory estoppel theory. In this particular case, UBC recites only the elements of the causes of action, not the factual basis supporting any purported elements. Indeed, their entire complaint is devoid of any factual support necessary to sustain any of its chosen causes of action against York, and ultimately, their claims and their complaint is fatally deficient for that reason. In particular, Chapter 541, UBC alleges that York alleges four different sections of Chapter 541, each of which precludes specified actions by certain individuals in relation to a claim by an insured or a beneficiary. Under Section 541-060-A1, which prohibits misrepresenting a claimant to a claimant, a material fact or policy provision relating to the coverage at issue. Here, UBC does not allege any false statement by York at all. Indeed, they don't allege that York misrepresented any material fact relating to coverage, and they don't allege that York misrepresented any policy provision relating to coverage. As the Court knows, a misrepresentation must be both specific and affirmative to be actionable. There are no such allegations here. How often have you heard of an adjuster telling somebody, it looks as if your claim is going to be X amount over the policy limits, and then they come back with something that's triple that after the work has been done? Say, too bad, homeowner, this is your problem now. Your Honor, it's unfortunate that UBC did not purchase more coverage for their code limit upgrade. Well, I'm not sure. I mean, I'd never heard of code limit upgrades anyway, but is that standard practice? Yes, sir. Your Honor, it depends on the policy, but there can be various code limit endorsements which allow the insured a certain amount for which to have monies available if a code limit upgrade is necessary in the event of a repair. Buy that if you have an older property? Your Honor, I don't know exactly what might be available to all the insurers. I think it depends probably on the insurance history, the location, and various other factors. What about failure to properly settle? Yes, Your Honor. There is no allegation here that York, as the adjuster, had any authority to settle the claim at all, and there's no allegation here that York denied any such claim. In fact, what we're talking about here is a bid, which is part of the process, but it's not the claim itself, so I think we're conflating two different principles here, a bid and a claim, and there's nothing to accept. There was nothing for York to accept. What happened was the roofer, UBC's roofer, actually submitted a bid, and then York asked for backup on that bid, and when they got a response, UBC's roofer, Jeff Eubank-Roofing, essentially told them that we tried to do a revised bid, but when we got to that same amount, we just stopped because they couldn't do it for the amount from the original bid. And so given the date of the church and the uniqueness of the job, the parties agreed to move forward on a time and materials approach because it wasn't quite clear what was to be expected based on the allegations that we have here. Who just stopped? The roofer just stopped? So, yes, the roofer submitted an original bid, York asked for backup, and then when UBC's roofer was preparing a revised bid, they stopped. It was they stopped, that's what I want to make sure. The roofer, I'm sorry. The roofer stopped. Yes, Your Honor. I thought there was some indication that the fellow who worked for the roofer said I would have been fired if I hadn't been asked to do the backup. Your Honor, and that's not part of our record here in this particular case because this is just on the 12B-6. Maybe it's in the other case. Yes, Your Honor. I think that issue could be addressed by Lexington in their matter, so I'm not familiar with that particular affidavit or reference. But this claim, for the reasons I stated, there's no alleged misrepresentation that is either specific or affirmative in this particular case, and UBC's complaint does not contain any alleged misrepresentation by York. What about the evidence that the roofer said I would have honored the original bid? Well, Your Honor, again, that's not part of our record in this particular matter, but I think the other thing we have. Is it in your record? No, Your Honor. That's not part of this particular record. This record is just on the 12B-6 proceedings between York and UBC. There's a separate record. It's not pled. No, Your Honor. It is not pled. There's no allegation. That's correct. There is no allegation that they would have honored that bid. It seems to me that's the basis of their entire claim against the adjuster, that absent the adjuster's interference, the roofer would have honored the original bid. So I thought that was pled. I'm sorry. No, Your Honor, that's okay. And I think just noting that that's not part of the record here, but it also ignores the fact that the roofer or any contractor, if they were completing a job, could have come back in and said, hey, the original bid that we made is not going to be sufficient in order to do the repairs that we need to undertake. And in order to do so, we need to go ahead and give a change order or a revised bid or a revised order. And that generally happens frequently. UBC's claims under A2A also fail. That particular section prohibits failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear. In this particular case, again, we're going by the amended complaint, UBC's amended complaint. And here UBC does not allege facts that York had a duty to effectuate settlement. They don't allege facts that York had the authority to effectuate a settlement. And they don't even allege that York failed to act in good faith. Their claims likewise fail under A3 of the code. A3 prohibits failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy in relation to the facts or applicable law for the insurer's denial of a claim or offer of a compromise of a settlement of a claim. Again, UBC's amended complaint in this case, and again, they have multiple pleading attempts, they don't allege facts that York had the duty or authority to provide any explanation. They also don't allege that York denied any claim or that it even had any authority or duty to deny any such claim. Finally, under Section A7, which prohibits refusing to pay a claim without conducting a reasonable investigation with respect to a claim, UBC does not allege facts that York refused to pay any claim or that anyone refused to pay any claim.  Given the complete absence of necessary factual allegations, their claims under Chapter 541 are fatally deficient, and the decision to dismiss must be affirmed. Similarly, their claims under the DTPA, the only one that remains is Section 17.50A4, which is the tie-in statute. That requires an underlying violation of the insurance code, and because their claims under the insurance code fail, their DTPA claim likewise fails. Their final theory is promissory estoppel, and as the name indicates, it requires a promise. Again, UBC's complaint does not allege a definite and unconditional promise by York. It also doesn't allege any substantial reliance on any promise by York, much less that any such reliance would have been reasonable or justified or that it would have materially changed its position in reliance on a promise to its detriment. Rather, this theory is a simple attempt to navigate around their policy, their contract of insurance, with Lexington. It's an impermissible attempt to expand coverage. What does an adjuster normally do in a circumstance like this? Your Honor, in terms of their investigation, they go out and they assess the damage, and then they work with a contractor or with the insured, a contractor retained by the insured or the insured themselves, in order to figure out a way forward so that repair is going to be done. Yeah, but they didn't communicate with the insured. Well, Your Honor, I think the amended complaint actually indicates that they did communicate with the insured, and there's discussion later on in the paragraph 33 where they talk about the pastor and York, and York explaining to the pastor that they were surprised. Excuse me, I think it was they were alarmed at the skyrocketing cost. I think it's also important to point out that the roofer, UBC's roofer, started on this job before York was aware that they started on the job, and it's not clear from the record, which is just the amended complaint, how long they had been working on the job and how long that work had been ongoing. I didn't see that. Is that in the briefs? Yes, Your Honor. It's, excuse me, paragraph 28. I think I referenced 33. It's 28. It says, I remember that. I did not remember the statement that the roofer had started on the job already. Yes, ma'am, and that is in paragraph 24. It's 241 of the record. Before Jeff Ubank roofing was cleared by defendant York to start the redecking on a quote-unquote time and materials basis, it had already started to replace the roof. So for these reasons, and those set forth— Why did the—I mean, it was the adjuster that decided to replace the roof instead of just some of the tiles, right? No, Your Honor. The adjuster doesn't make the ultimate decisions as to, you know, how the— Well, that's what increased the price, right, that and the code? The roof tile is part of the issue, but the code upgrade was the primary complaint with respect to York, is that it exceeded their code upgrade limit, which they were aware of in fairness under Texas law and ensured is required to know the policy terms. No, I understand all that, but the— $600,000 or is it $400,000? What's all attributable to the code compliance? I see, Your Honor. It's not entirely clear from the amended complaint what that amount consists of. It appears that it may be due to the code upgrade, although there is some allegation about the replacement tile and it not being up to a quality that they had requested. Your Honors, for all these reasons stated here today and for those set forth in our briefing, UBC fails to state a plausible claim upon which relief can be granted, and we ask this Court to affirm this dismissal. I'd like to go ahead and return any remaining time unless Your Honors have any further questions, and I thank you for your time. All right, sir. After you, Mr. Taylor. I will try to address all these on rebuttal, starting with pleading standards. Pleading standards are basically plausibility. You know the standard very well. You hear Mr. Rosen say that just pled conclusion, just pled the elements of the claim. Well, what he's focusing on there is the causes, the causes of action there, which do, as is pretty normal in my experience, recite the elements of each claim. But the Supreme Court and this Court before it made clear you don't even have to list the elements. You don't have to go into the legal theories, Johnson, Skinner, et cetera. Most particularly, you don't have to pin your facts to the legal theory, which is the problem that I believe Judge McBride had with this. We certainly don't have just legal conclusions. I think we've got 33 paragraphs of factual conclusions or factual allegations, and I think most, most, we got a little far afield with the questions. I think most of what I said, the facts were, are facts that are consistent that come out of the pleadings here about the scope representations, the agreement to do with time and materials, et cetera. All of the things we discussed are things that are in the factual basis of the pleadings, and it's not required by Rule 8 to pin. Did you allege that the roofer would have complied with the original bid? No, and I don't believe that's something that could have been alleged without discovering, but I don't think there was any reason to because it's plausible for a jury to infer that a roofer would comply with his bid if it had been accepted. It's plausible that a person, once their offer is accepted, will comply with it. That's what the law expects they will do. That's the ordinary thing. But even if it wasn't, that's within the scope of things that discovery should develop. And so I think we've got the lengthy factual recitations. Did you allege that the adjuster had the authority to resolve the claim? No, and that goes back to two issues with that. One, that goes to the Messerschmitt issue, which I started off. If you all take a look at the Messerschmitt briefing, that's the big dispute between all four district courts in this circuit that really needs to be resolved here. What does effectuate mean? As Judge Fish, I think, in the Roach opinion explained, plain meaning is much broader than just make a decision. It's part of the investigation. It's the process that all of that goes to effectuate. If he's right, then adjusters are liable for that, and a failure to work toward that process, interrupting that process, is a violation. How is that even put before us if you didn't allege they had the authority? Well, that's for the same reason it's all in the other. He certainly had the, as Judge Fish and the many other, half the district judges, decide the plain meaning of effectuate is broader than authority to settle. He had the authority to investigate. We know that. He was the prime communicator. What did you allege specifically? What duty did you allege that the adjuster breached? Effectuate. I wish I could quote his language, but the plain meaning of effectuate is to bring about the process, not to make the final decision. There are numerous cases cited in the briefs, I think, of various courts that say this is normal, that the adjusters have a role in all these different parts. But I think a jury could infer, plausibly infer from our allegations, that he had authority here because all of the communications, everything he was doing here was through this foreman, through York, to the insurer. If you didn't allege that the roofer would have complied, where does that get you? Again, I don't think we need to. I don't think anybody has to allege that a party will comply with an offer if it's accepted. We assume people will do that. We will assume that's the foundation of contract law. That's the foundation. There wasn't a contract. There was a bid that nobody accepted. There was a bid that never got accepted that could have been accepted, and the allegations indicate it wasn't accepted because of the actions of York, that York did not effectuate it. Instead, they did exactly the opposite. Then, if we get past that, though, you had asked about misrepresentations. I didn't ever get to those, but we do have some examples. Paragraphs, let's see, page 242 of the York record, paragraphs 22 and 25, include statements that a jury could look at and infer that those were misrepresentations. He uses the phrase specific and actionable as the requirement, but he ignores the fact that Texas law normally recognizes that actionable misrepresentations include implied misrepresentations and include nondisclosures. If you say something that's technically true, I think this is your court's access media case, say something that's technically true but it's misleading, you have a duty to correct yourself, to make it not misleading. The Anderson-Greenwood case. What statement was misleading here? Paragraphs 22, we've got this is after the adjuster supposedly already agreed with the roofer, quote, agreed. It says code upgrade costs are indemnified once incurred. Okay, without stating that even though we're in this weird time and materials process, you're still subject to the policy limits. That was a misleading statement, or a jury could determine that that was misleading and led to He's going to put Pastor so-and-so on the stand to testify, and he's going to say, well, I thought York promised me that they would cover the upgrade once incurred, and then somebody's going to show him the contract and say, but Pastor, isn't the limit in the contract $250,000? That's putting a man of the cloth in a real difficult position. I don't think it will because of the unique situation in this case because this time and materials approach that he used, that he'd only used once before ever in his entire career, is not something that's explained in the contract. It's not something anybody would reasonably understand, and when he agreed to shift this and then made subsequent representations about that, that costs would be indemnified, that there's a reference to a phone call, paragraph 25, that you told me on the phone that provide the funds for the works required by the engineer. I know you told me on the phone it would be included. Okay. Just as an insurer is supposed to know the terms of the contract, so is the ‑‑I mean, just as the insurer. You did implicit that it's up to $250,000, but we're not going to pay $800,000 or $600,000. Excuse me? I withdraw the ‑‑never mind. So I ‑‑ Let's shift gears, Mr. Taylor. I think we've, yeah, we've kind of exhausted the pleading one. I mean, so we'll shift gears. Thank you, Mr. Rosen on the York side. And this one, Mr. Taylor, you're still here. So we sort of mentally shift gears to the second one.